THE CHENANGO BRIDGE COMPANY *v.* THE BINGHAMTON BRIDGE COMPANY.

*It seems* that the act incorporating the Susquehanna Bridge Company (ch. 89 of 1805, § 38), and made applicable to the Chenango Bridge Company (ch. 119 of 1808), does not, by giving it all the rights of the Delaware Bridge Company, confer upon it the benefit of a provision in favor of the latter company that no bridge should be erected within two miles of its bridge across the Delaware, so as to guarantee the former against the erection of a bridge within the like distance from its bridge across the Chenango: *Per* WRIGHT, DAVIES and MARVIN, Js.

But if that be otherwise, the provision that it shall not be lawful for any person to erect such bridge, or to establish a ferry, within two miles, is to be construed as prohibiting the establishment of a bridge or ferry under the laws then existing, and not as a contract, by which the legislature renounced its power to authorize such bridge or ferry at any future time.

APPEAL from the Supreme Court, where the plaintiffs commenced this action in the year 1856, to restrain the defendants from using, or allowing travel or taking toll upon, a certain toll bridge erected by the defendants across the Chenango river at Binghamton, in violation, as the plaintiffs claimed, of the exclusive right secured to them, under the act of the legislature pursuant to which their own bridge over said stream was erected.

By an act of the legislature, passed in the year 1805 (ch. 89), a corporation was created, entitled "The president and directors of the Newburgh and Chenango turnpike road company," for the purpose of constructing a turnpike road from the village of Oxford, in Chenango county, to a point mentioned on the Newburgh and Cochecton turnpike road, crossing on the route the Susquehanna river, and the east and the west branches of the Delaware river. A right was reserved in the legislature to dissolve the corporation, and to vest its rights and interests in the State, by repaying the money it might have expended and ten per cent interest thereon. By

Chenango Bridge Company *v.* Binghamton Bridge Company.

a subsequent part of the same act, another corporation, called
the "Neversink Turnpike Road Company," was created to con-
struct a road from a point on the Chenango river at or near
Chenango Point (now Binghamton), to intersect the road of
the first mentioned corporation at a point mentioned; and also
a road from another point on the first mentioned road on a
certain route through the town of Neversink to a highway
leading to Kingston Landing. The act then proceeded with
the following recital: "Whereas, the foregoing road incor-
poration cannot be successfully carried into effect, or the public
convenience fully promoted, if durable and permanent bridges
across the Susquehanna and Chenango rivers, and the east and
west branches of the Delaware river, at the several places of
intersection of the said roads, are not at the same time erected
and maintained; and whereas, by reason of the great expense
necessarily to be incurred in erecting and maintaining such
bridges, on account of the size and rapidity of these streams, and
the extraordinary freshets and frequent obstructions, happen-
ing in these rivers to which such bridges will be exposed, and
which will endanger their permanency and durability, and
may call for a frequent renewal of the whole capital required
for rebuilding such bridges, and therefore require a power
(not contained in the foregoing incorporation), of calling from
the stockholders from time to time such sums as shall be
required for upholding such bridges, and which equally for-
bid the policy incorporated in the foregoing incorporation, that
said property shall revert to the State; and whereas, it is
suggested that it will be most expedient for the purposes
aforesaid to make two separate and distinct bridge incorpora-
tions, with powers adequate to the accomplishment thereof in
the best possible manner, therefore," the act proceeds to create
a corporation to be called "the president and directors of the
Delaware Bridge Company," to erect bridges over each of the
said branches of the Delaware river, where the said branches
are crossed by the route of the said turnpike road. The usual
detailed provisions are made, including a tariff of tolls which
the company is authorized to exact from persons crossing the

bridges.   A provision in the following words is contained in the 31st section: "And be it further enacted, that it shall not be lawful for any person or persons to erect any bridge or establish any ferry *across the said west and east branches of Delaware river, within two miles either above or below the bridges to be erected and maintained in pursuance of this act,* except between the times the said bridges, or either of them, shall not be passable," &c.   There is a proviso by which persons are allowed to cross the streams in their own boats.   The 36th section declares that, after the expiration of thirty years from the passage of the act, the bridges and their appurtenances shall become the property of the State.

The 38th section provides for the incorporation of another bridge company, to be called the "Susquehanna Bridge Company," for the purpose of erecting and maintaining a toll bridge across the Susquehanna river at or near Oquago, in the county of Tioga, and for erecting and maintaining another toll bridge over and across the Chenango river, at or near Chenango Point, in that county.   It is declared that the persons associating to form this company shall be and they are thereby created a body politic and corporate, by the name mentioned, and that they and their successors and assigns "shall and may have perpetual succession, and shall be, and hereby are, invested with all and singular the powers, rights, privileges, immunities and advantages, and shall be subject to all the duties, regulations, restraints and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company; and all and singular the provisions, sections and clauses thereof, not inconsistent with the particular provisions herein contained, shall be, and hereby are, fully extended to the president and directors of this corporation."

The bridges over the Susquehanna and Chenango rivers were not immediately erected, and in 1808 another act on the subject of these corporations was passed.   So far as concerns the present question, it declares that the incorporation of the Susquehanna Bridge Company shall thereafter be deemed and considered to exist for the sole purpose of erecting and main-

taining a toll bridge under their charter across the Susquehanna river at Oquago, with a capital stock of ten thousand dollars, under all its present provisions, except the limitation of its duration of thirty years, which said limitation, it is declared, shall be and thereby is repealed. The section next following is in these words: "And be it further enacted, that for the purpose of erecting and maintaining a toll bridge across the Chenango river, at or near Chenango Point, the present stockholders of the Susquehanna Bridge Company, or such others as shall associate for that purpose, before the first day of January next, shall be and hereby are created a body corporate, in fact and in name, by the name of 'The Chenango Bridge Company,' and as such to have perpetual succession, under all the provisions, regulations, restrictions, clauses and provisions of the before mentioned Susquehanna Bridge Company; and their capital in stock shall consist of ten thousand dollars."

The plaintiffs were duly incorporated, and erected a bridge across the Chenango river at Chenango Point, pursuant to this act, in 1808, and have continued to maintain one there until the present time, having rebuilt it in 1825, and again in 1845. They have received tolls according to the act, and have made dividends for the last twenty years, at the average rate of about sixteen per cent on the nominal capital of ten thousand dollars, but between sixteen and seventeen thousand dollars have been actually paid in. What is now the village of Binghamton, and which contains nearly ten thousand inhabitants, was called Chenango Point in 1808, and then embraced fifteen or twenty dwellings, and the ground upon which the present village stands was mostly a wilderness. At that time the surrounding country was sparsely populated, and there was but little travel. The plaintiffs' bridge crosses the Chenango about eighty rods above its mouth, where it empties into the Susquehanna. At present the village lies on both sides of the Chenango river, about fifteen hundred of the population being on the west side, and the remainder on the east.

In the year 1826 the legislature was petitioned for authority

Chenango Bridge Company *v.* Binghamton Bridge Company.

to erect a new bridge near that point, but the application was rejected on the ground that it would interfere with the plaintiffs' vested rights. A similar unsuccessful attempt was made in 1854; but in 1855 the defendants were incorporated by an act of the legislature (ch. 164), with authority to construct a bridge across the Chenango river, in the village of Binghamton, at a point not less than eighty rods above the present bridge. The rates of tolls were to be the same which were authorized to be taken by the Susquehanna Bridge Company.

Pursuant to this act the defendants have erected their bridge across the Chenango about eighty rods above that of the plaintiffs, by which travel has been diverted from the plaintiffs' bridge, whereby their tolls have been greatly diminished.

The trial took place before Mr. Justice GRAY in 1857. He decided that the plaintiffs were not entitled to recover, and gave judgment for a dismissal of the complaint, which judgment was affirmed at the general term in the sixth district. Opinions in writing were given at the special term by Mr. Justice GRAY, and at the general term by Mr. Justice MASON; and in both the conclusion reached was, that the prohibition against the erection of other bridges within two miles, contained in the provisions of the act of 1805, for incorporating the Delaware Bridge Company, was not applicable to the plaintiffs' bridge, constructed under that act and the act of 1808, the reference to that prohibition not being sufficient, as it was thought, to make it a part of the Susquehanna or of the Chenango Bridge corporations. The plaintiffs appealed here. The case was submitted on printed arguments by

*H. R. Mygatt*, for the appellants.

*Dickinson & Wright*, for the respondents.

WRIGHT, J. The Constitution of the United States declares that "no State shall pass any law impairing the obligation of contracts." (U. S. Const., art. 1, § 10.) The provision, interpreted by the light of history, has been supposed by many only to have been intended to apply to executory contracts;

but a far more extended interpretation has been given to it by that court which possesses the ultimate right of passing upon the question, and whose decisions we are bound to respect and follow as the law of the land. Not only has it been settled that an executory contract, but, also, that a grant or executed contract, comes within the scope of the provision; and that a legislative grant of a franchise to a corporation to maintain a bridge or ferry, or turnpike road, is a contract, if the grant be accepted, within the meaning of the section, which no subsequent legislature can interfere with, even to promote the public good, if by such interference the private interests of the corporators are affected. (*Fletcher* v. *Peck*, 6 Cranch, 87; *Dartmouth College* v. *Woodward*, 4 Wheat., 518; *Green* v. *Beddle*, 8 id., 2; *Gordon* v. *The Appeal Tax Court*, 3 How., 133; *State Bank of Ohio* v. *Kemp*, 18 id., 369.) It may be doubted whether it was wise and legally sound to attribute to a legislative act, granting to a corporation an exclusive right to maintain a bridge or ferry, and exact compensation from the public for crossing a stream at a given point, the force of a contract, within the constitutional provision. But such is clearly the doctrine and effect of the series of adjudications referred to. It is no longer to be questioned that a private company, to whom a State legislature has in express terms granted the exclusive right of maintaining a bridge and exacting tolls for crossing a stream at a designated locality, when the franchise has been accepted and acted under by the corporation, and no power is reserved to alter or repeal the law, is protected, even though the public interest may suffer, by the constitutional prohibition against any subsequent legislation which is, or permits, a direct interference with the enjoyment of the franchise or diminishes its value. Any law of that character, it is held, impairs the obligation of the contract between the State and the corporation, and is within the purview and prohibition of the Federal Constitution. The right, however, alleged to have been impaired or invaded, must have been given or granted expressly, and will not be implied. Public grants are to be construed strictly, and neither indivi-

duals nor corporations will be deemed to have original rights, as against the State, by implication. In the grant of privileges to a corporation, nothing passes but what is granted in clear and explicit terms, and by words too plain to be mistaken. "When a State," says Judge BLACK, in the case of *The Pennsylvania R. R. Co.* v. *The Canal Commissioners* (21 Penn., 22), "means to clothe a corporate body with a portion of her own sovereignty, and to disarm herself to that extent of the power that belongs to her, it is so easy to say so, that we will never believe it to be meant when it is not said. * * In the construction of a charter, to be in doubt. is to be resolved, and every resolution which springs from doubt is against the corporation. If the usefulness of the company would be increased by extending them [privileges], let the legislature see to it, but remember that nothing but plain English words will do it. The wisdom of such a rule of construction will not be questioned by any one who has at heart the safety and preservation of his State government. (*Richmond R. R. Co.* v. *Louisa R. R. Co.*, 13 How., 71.)

The plaintiffs were incorporated in 1808, by a single section of an act purporting to amend "The Neversink Turnpike Road and Susquehanna Bridge Companies," incorporated by a previous act, in 1805. This last named act created five corporations, amongst which were two bridge companies, viz., "The Delaware Bridge Company" and "The Susquehanna Bridge Company;" the first to erect and maintain bridges across the east and west branches of the Delaware river, and the other to erect and maintain a bridge across the Susquehanna river, at Oquago, and another across the Chenango river at or near Chenango Point. The section referred to, as incorporating the plaintiffs, was without detail, except as to the amount of capital, simply providing "that, for the purpose of erecting and maintaining a toll bridge across the Chenango river at or near Chenango Point, the present stockholders of the Susquehanna Bridge Company, or such others as shall associate for that purpose before the first day of January next, shall be and hereby are created a body corporate, in fact and

in name, by the name and style of 'The Chenango Bridge Company,' and as such to have perpetual succession, under all the provisions, regulations, restrictions, clauses and provisions of the before mentioned Susquehanna Bridge Company, and their capital in stock shall consist of ten thousand dollars." (Laws of 1808, ch. 119.) It will be observed, therefore, that there was no legislative grant, in terms, of the rights and privileges to be possessed and enjoyed by the corporation, but the intent is plain that they were to be the same as those granted to the Susquehanna Bridge Company, not only in its original charter, which provided for the erection and maintenance of both bridges, but also by the amendment of such charter, in the act incorporating the plaintiffs.

In pursuance of this act the plaintiff's corporation was organized, and proceeded to erect a bridge across the Chenango river, at the point designated, at about eighty rods from the southerly termination of such river. For more than half a century they have maintained the bridge, and have reaped therefrom, for the last thirty years, in the way of dividends on their capital stock, nearly seventeen per cent per annum. In the meantime, Chenango Point, now called Binghamton, the locality of the bridge, has, from an inconsiderable settlement, become a large and prosperous village, located on the east and west sides of the Chenango river, and having, in 1857, nearly ten thousand inhabitants. Up to 1855, there was no way for that portion of the population residing on the west side of the Chenango to cross it except by the plaintiffs' bridge. In 1855, to promote the public convenience, the legislature incorporated the defendants, "with power to construct another bridge, at a point not less than eighty rods above the plaintiffs' bridge. (Laws of 1855, ch. 164.) The construction and use of the defendants' bridge has, to some extent, diminished the profits of the plaintiffs' franchise; and it is therefore claimed by the latter, that the law incorporating the defendants and empowering them to erect and maintain their bridge is unconstitutional and void. It is not pretended, of course, that the plaintiffs' right to maintain their bridge,

and exact tolls from the public for crossing it, has been interfered with, but the ground taken is, that their grant gives them a monopoly of the waters of the Chenango for the distance of two miles above and below their bridge; that their charter contains, in effect, a stipulation on the part of the State, when perpetually surrendering into their hands a portion of its sovereignty, neither to sanction competition nor to maintain, or authorize to be maintained, any other similar improvement within two miles each way from their bridge, that might diminish the amount of their income. Undoubtedly, if the charter of the plaintiffs gave them an exclusive privilege over the waters of the Chenango river to the extent of four miles, up and down the stream, for bridge or ferry purposes, and the legislature, in the contract with them, deliberately and intentionally surrendered, for all time, the power of the State to make improvemements for the public accommodation within those limits, any subsequent law, establishing or authorizing the establishment of another bridge or ferry, would be within the constitutional prohibition. On the contrary, if such exclusive privilege is not given in clear and explicit terms, and a reasonable construction of their charter, or of the act incorporating them, renders it doubtful whether the State meant or intended to disarm herself, to the extent claimed, of her sovereign authority, the exercise of such authority, in 1855, when the public necessity required it, would be unobjectionable and valid, even though its tendency might be to lessen the value of the plaintiffs' franchise. It is, therefore, a principal question in this case, whether the privilege asserted by the plaintiffs be or be not secured to them by the acts of 1805 and 1808.

The plaintiffs, as has been mentioned, were endowed with the corporate rights and functions of the Susquehanna Bridge Company. This latter corporation had been originally created for the purpose of erecting and maintaining a bridge across the Susquehanna river, on the line of one of the branches of the Neversink Turnpike Company, and also a bridge across the Chenango river, at the starting point of such branch road.

The act of 1808 limited its functions to the erection and maintenance of the first-named bridge, and created the plaintiffs an independent corporate body, to erect and maintain a bridge across the Chenango, at or near Chenango Point. For the terms of the plaintiffs' charter, we are to look to that of the Susquehanna Bridge Company; and, looking into the act of 1805, it is seen that the rights and privileges of the latter company are not defined, but it is provided, in a single section, that it is to have perpetual succession, and be "invested with all and singular the powers, rights, privileges, immunities and advantages, and be subject to all the duties, regulations, restraints and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company," and "all and singular the provisions, sections and clauses thereof," not inconsistent with the particular provisions contained in the section incorporating the Susquehanna Bridge Company were fully extended to such corporation. For the terms, therefore, of the charter of the Susquehanna Bridge Company, resort must be had to the prior sections of the act of 1805, incorporating the Delaware Bridge Company. Of course, the intention, by the general language, was not to import into the Susquehanna Bridge Company charter the provisions *in hæc verba* of the sections of the act creating the Delaware Bridge Company; but I think the intention is plain to invest the former company with all the powers, rights and privileges pertaining to a bridge corporation, as such, and similar to those which had just been given and accorded to the latter, subjecting it to like duties, regulations and restraints. All the provisions of the act in respect to the Delaware Bridge Company, which related to its corporate powers, the manner of organization, kind of bridge to be erected, and when to be completed, the right to erect gates and demand and receive tolls at either end of the bridges, the neglect to repair or rebuild which was to work a forfeiture of the charter, the duties enjoined in respect to the care and superintendence of the bridges, and the penalties imposed and to be enforced, were made applicable to the Susquehanna Bridge Company, and

the section incorporating it should read as though similar provisions were literally embodied in it. But more is insisted on; for if this was all, there could be no pretext that the alleged bargain between the State and the plaintiffs embraced any engagement from the State that competing bridges or ferries should not be erected or allowed for the distance of two miles above and below their bridges. Hence it is sought to further import into the charter of the Susquehanna Bridge Company a provision of the act limited in words to the bridges to be erected by the Delaware Bridge Company across the east and west branches of the Delaware river. The 31st section of the act provides that "it shall not be lawful for any person or persons to erect any bridge or establish any ferry across the said west and east branches of the Delaware river, within two miles above or below the bridges to be erected and maintained in pursuance of this act," &c. It is assumed that this provision, although not in express terms, was tantamount to an engagement on the part of the State, which entered into and formed a part of the contract with the Delaware Bridge Company, that no competing bridge or ferry should be erected or allowed, during the continuance of the corporation, for two miles above and below these bridges; that the exclusive privilege thus given was carried, by force of the general words employed, into the Susquehanna Bridge Company charter, and as the plaintiffs were endowed with the rights, privileges and capacities of the latter company, not the identical monopoly, but a similar one, over the waters of the Chenango river, was secured to them.

I think this position not tenable, for reasons that will be stated:

1. The privilege, whatever may be its character, is not given in terms to the Chenango Bridge Company, nor does the provision relate to a monopoly of the waters of the Chenango river, but, on the contrary, the words of the act limit the prohibition to the west and east branches of the Delaware river. But it is claimed that the legislative intent is manifest that the plaintiffs were to possess and enjoy the "rights, privileges and

advantages " of the Delaware Bridge Company, and as one of those " advantages " consisted in a monopoly of the streams over which their bridges were to be erected, for two miles each way from the bridges, a like monopoly of the Chenango river was intended to be given to them. The acts of 1805 and 1808, however, afford no satisfactory evidence that the legislature intended to grant such a monopoly to the plaintiffs. The leading purpose of the act of 1805 was to establish a corporation for making a road from Oxford, in the county of Chenango, to intersect the Newburgh and Cochecton turnpike road, at a point easterly of the east branch of the Delaware river, and, as subsidiary thereto, another corporation to open a communication, by a turnpike road, from Chenango Point to Kingston. The bridge incorporations were but secondary, and, as was afterwards expressed, were created to sufficiently carry into effect the road incorporation. The Chenango road was to cross the west and east branches of the Delaware river, and the west branch of the Kingston or Neversink road, starting from Chenango Point, the Susquehanna river, and, it might be, the Chenango river. The act first provided for the incorporation of the Newburgh and Chenango Turnpike Company, reserving the power to dissolve the corporation and vest its property in the State when the income arising from the tolls had paid for making the road, together with an interest on the moneys expended of ten per cent per annum. The Neversink Turnpike Road Company was next created, with the same provision as to a dissolution of the corporation, and vesting its property in the people of the State. The act then set forth, in the form of a preamble, the necessity, with the view of sufficiently carrying into effect the foregoing road incorporation, and fully promoting the public convenience, of erecting and maintaining durable and permanent bridges across the Susquehanna and Chenango rivers, and the east and west branches of the Delaware river, at the several places of intersection of the said roads; that, from the size and rapidity of the streams, great expense would be necessarily incurred in maintaining and erecting such bridges; and, from

the extraordinary freshets and frequent obstructions happening in those rivers, which would endanger the permanency and durability of the bridges, a frequent renewal of the whole capital might be required for rebuilding them, and, therefore, require a power (not contained in the foregoing incorporation) for calling from the stockholders, from time to time, such sums as should be required for upholding such bridges; that these circumstances forbade the policy incorporated in the foregoing road incorporations, that said property should revert to the State; and that it would be most expedient, for the purposes aforesaid, to make two separate and distinct bridge incorporations, with powers adequate to the accomplishment thereof, in the best possible manner. The act then proceeds to create a corporation by the name of "The president and directors of the Delaware Bridge Company," for the purpose, as expressed, of erecting bridges across the west and east branches of the Delaware river, when the turnpike road to be laid out by virtue of the act should cross the same. Provisions for subscription to stock and for formally organizing the company, describing the kind of bridges to be built, and when to be completed, the power to demand and receive certain rates of toll at each of the bridges, and other regulations and restraints followed. Amongst the provisions was one before stated, declaring "it unlawful for any person or persons to erect any bridge or establish any ferry across the said west and east branches of Delaware river, within two miles above and below the bridges to be erected and maintained in pursuance of this act." The corporation was to have continual succession for the full term of thirty years from the passage of the act, and at the expiration of such term the bridges, with their appurtenances, were to become the property of the State. The next provision in order was the incorporation of "The Susquehanna Bridge Company." For the purpose of erecting and maintaining a toll bridge over and across the Susquehanna river, at or near Oquago, in the county of Tioga (a point of intersection of the turnpike roads), and also for the erecting and maintaining of a toll bridge over the Chenango river, at or near Chenango

Point (the starting point of the Neversink road), all such persons as should associate for that purpose, and their successors and assigns, were created a body corporate, by the name of " The Susquehanna Bridge Company," to have perpetual succession and be invested with the powers, rights, privileges, immunities and advantages, and be subject to all the duties, regulations, restraints and penalties which were contained in the foregoing incorporation of the Delaware Bridge Company; and all the provisions, sections and clauses thereof, not inconsistent with the particular provisions contained in the section creating the Susquehanna Bridge Company, were fully extended to the latter incorporation. As it was thus provided that this corporation was to have perpetual succession, it could hardly be inferred that it was the original intention that the provision limiting the existence of the Delaware Bridge Company to thirty years, and a reversion of its property to the State, should apply to it; but the act of 1808 settles any doubt that might have been entertained as to the effect of the general words of the section, by a repeal of the thirty years limitation, and making the existence of the Susquehanna Bridge Company perpetual, whilst it divided it into two companies.

The policy indicated, therefore, by the legislative action, was not the same in respect to the two, and ultimately the three, bridge incorporations. The duration of one of them (the Delaware Bridge Company), was limited to thirty years, when its bridges were to revert to the State; and it might well have happened that those across the east and west branches of the Delaware river would become State property and free bridges, before the turnpike road, of which road they were a part, would revert. The others were to exist forever, as private corporations, notwithstanding the turnpike road on which they were situated might become public property. It was evidently the purpose of the legislature to offer similar inducements to adventurers, and to place the several road and bridge companies on an equal footing as to advantages. There is nothing to indicate that in the view of the legislature one of the contemplated bridge enterprises was of more public

importance than the other, or that it was necessary to hold out greater inducements in the one case than in the other. Certainly a perpetual bridge franchise, in that part of the State, at that time, was to be regarded as more valuable, without an engagement from the State not to sanction competition, than one to endure only for thirty years with such engagement written in it; and it ought not to be assumed, without the strongest evidence, that a legislative act which cautiously refrained, as to one bridge incorporation, to bargain away the power of the State, for all time, to make improvements in a particular section for the public accommodation, intentionally bargained away such power to another corporation, in no sense more meritorious. Can it be said, then, that it was intended to confer larger privileges and advantages on one of the corporations than on the other? I think not. It may have been meant that the Delaware Bridge Company, which was to endure but for thirty years, should enjoy a monopoly of the waters of the two branches of the Delaware river; but it is not a reasonable inference that such a right was designed to be conferred on a corporation created for similar purposes, and in the same legislative scheme, to which perpetual existence was given. A provision forbidding competition by individuals was doubtless of importance at that early period, and it is at all times, to either bridge or ferry proprietors; but it was of especial importance to a corporation that could only look thirty years ahead for a reimbursement of its outlays, or for a realization of profits from its franchise. There would be no equality in advantages, proffered to bridge companies of equal merit, in a scheme which designedly gave a like monopoly to one whose existence was made perpetual. No satisfactory reason can be assigned for the distinction as to the durability of the charters, unless it be that the legislature only contemplated conferring on the companies to whom perpetual existence was given, the right to erect and maintain toll bridges, at the points named, without any monopoly of the streams.

Again, the provision in the Delaware Bridge Company

incorporation, declaring it to be unlawful for any one to set up competing bridges or ferries, cannot, by any just interpretation of the act or of legislative intention, be carried into the Susquehanna Bridge Company charter. Nothing is to be deemed carried into it, by the general words used, that is inconsistent with the particular provisions of the section creating the last named corporation. A purpose of its creation was to construct a bridge across the Chenango river, at or near Chenango Point. It was as well known then as now, both by the legislature and the applicants for the charter, that the designated locality of this bridge was at the confluence of two rivers, and at a point where the Chenango terminated by emptying itself into the Susquehanna. It would have been an absurd provision to introduce into their charter that no one should establish a competing bridge or ferry on the Chenango river for the distance of two miles below their bridge. It was a physical impossibility to give the same monopoly of the waters of the Chenango as was given, as is alleged, to the Delaware Bridge Company over the waters of the Delaware river. It is not to be assumed that the legislature, or the parties interested in the application, contemplated any such absurdity.

2. Conceding that the section of the act of 1805, making it illegal for any person or persons to erect any bridge or establish any ferry across the west and east branches of the Delaware river, within two miles above or below the bridges to be erected and maintained in pursuance of the act, was, in substance, a stipulation on the part of the State to the extent expressed, entering into the contracts with both bridge companies, that competition should be prevented, I cannot well see how it can be construed as a restriction upon the sovereign authority. In terms, it is a restriction, if at all, upon persons, and as such was offered and accepted by the bridge companies. There was no guaranty written in the contract, that, if the public exigencies or interest required, the State would not exercise its sovereign power in the premises. Such a stipulation in a contract with the adventurers, it is urged, would

have been worthless and illusory. Not at all; but on the contrary it would have been indiscreet, not to say profligate legislation, to have bargained away forever State authority over the subject. As a restriction upon individuals and public officers and local authorities, it was of great importance to the adventurers. The riparian proprietors of the streams might have bridged them or crossed with ferries, except as forbidden by act of the legislature. There were then statutes providing for the opening and construction of highways and bridges by superintendents and commissioners of highways, and also for authorizing and regulating ferries within the State. The establishment and use of a ferry for profit was forbidden, unless duly authorized, and authority was conferred upon the Court of Common Pleas in each county of the State to grant licenses for keeping ferries, to such persons as the courts should think proper. It was certainly of consequence to the corporators that they should be protected against the otherwise lawful acts of these superintendents and commissioners of highways, Courts of Common Pleas and private persons. But it is said that if it was not a restriction upon the sovereign power, the legislature might have rendered the franchises comparatively valueless immediately upon the completion of the bridges, and before the corporators could be reimbursed, by the State establishing free or other bridges within the prescribed limits. This argument supposes that a State will act in bad faith; which supposition is not to be entertained. All experience attests the fact that the failure to realize any just expectations of remuneration from franchises of this character has never been attributable to broken public faith, and this applicants for the franchises know, and act accordingly. The object in introducing the provision, and the purpose it was intended to serve, seem to me plain. Without it, the riparian owners might have established a free bridge or ferry, the superintendents and commissioners of highways have laid out highways and constructed bridges across the rivers, and the Courts of Common Pleas have allowed ferries to be established across them, so as to have impaired, if not

wholly destroyed, the franchises. There were sufficient parties and officers and public authorities for the provision to apply to, and so that it might have full effect, without extending its operation to the State or the legislative authority. It is quite unnecessary to hold that it is or was intended as a restraint upon the legislative power, to give full force and effect to the language employed. Certainly the intention to surrender the sovereign authority to private corporations ought never to be implied, nor should the language of a statute be so construed as to deprive the State of her power to provide for the best interests of the people by appropriate and needful legislation, if it be susceptible of a different and reasonable construction. There is great force in the remark of Chief Justice TANEY, in the case of the *Charles River Bridge* v. *The Warren Bridge* (11 Pet.; 420), that " a State ought never to be presumed to surrender this power, because the whole community have an interest in preserving it undiminished ; and when a corporation alleges that a State has surrendered its power of improvement and public accommodation, the community have a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."

Upon the whole, I do not think the plaintiffs were entitled to sustain the action. The grant to them was the right to maintain a bridge across the Chenango river, at or near Chenango Point, and take certain rates of toll for crossing it. And this was the whole grant. There was no monopoly over the waters of the Chenango river above and below these bridges given to them ; nor any undertaking by the State, in the act of incorporating them, not to sanction competition, nor to make improvements that might diminish their income. In this respect they have no rights to be impaired, and consequently none which the courts are called upon to protect.

The judgment of the Supreme Court should be affirmed.

DAVIES and ROSEKRANS, Js., concurred on both the grounds stated by WRIGHT, J. SELDEN and MARVIN, Js., not conced-

ing that the plaintiff was not entitled to the same protection from competing bridges or ferries as that granted to the Delaware Bridge Company, were for affirmance, on the ground that the provision in favor of the latter did not import any restriction of the legislative power, but was satisfied by limiting the power of local authorities to authorize bridges or ferries under the existing laws.

EMOTT, J., (dissenting.) That the Chenango Bridge Company, which was created by the act of the legislature, passed April 1st, 1808, became vested with all the rights and privileges which had been previously conferred upon the Susquehanna Bridge Company by the 38th section of the act of April 6th, 1805, is sufficiently plain to need but little argument or remark. By the act of 1805, the Susquehanna Bridge Company was incorporated for the purpose of building a bridge over the Susquehanna river, near what was then known as Oquago, in the county of Tioga, and also another bridge across the Chenango river at Chenango Point, where the village of Binghamton has since grown up. The act of 1808, divided, as it were, the corporation into two. Its original capital was $20,000, and it was authorized, as I have mentioned, to erect and maintain two bridges, one over each of the rivers specified. It was now restricted under its original name and corporation to the building and maintaining one of the bridges which were included within its original design, that over the Susquehanna river, and its capital was reduced to $10,000, one-half its original amount. At the same time its stockholders, with any others who might associate with them, were created a new body corporate, under the name of the Chenango Bridge Company, with the power and right, exclusive of the parent organization, to build and maintain the Chenango bridge. The remaining $10,000, or one-half of the capital originally authorized, was set apart and designated as the capital of the new corporation ; and the corporation was declared to exist under all the provisions, regulations, restrictions, clauses and provisions of the Susquehanna Bridge Company's charter. The

obvious meaning and the effect of this was to create a new corporation, with all the powers, duties and liabilities which attached to that from which it sprang, at the time of its creation, subject only to such modification or interpretation of those powers as would be incident to the distinct object of the new company. It is contended that this did not confer upon the appellants the powers and privileges which were given to the Susquehanna Company by the act of 1808 itself, but only such as belonged to the latter by its original charter, and before the passage of the act which divided the original company into two corporations. But this would be a narrow and unreasonable construction of the act. The legislature incorporated the Susquehanna Company anew in 1808, changing materially not only the object but the conditions and character of its existence, and it at the same time chartered the Chenango Bridge Company for a purpose which had been included within the design of the original charter of the Susquehanna Company, but was now excluded from its powers. It would not be contended that both companies were authorized to bridge the Chenango river, or that the new company had any right to bridge the Susquehanna. The act of 1808, in conferring upon the Chenango Company the same rights as were possessed by the before mentioned Susquehanna Bridge Company, referred to the amended corporation, which was the creation or result of the amendment, made in the original charter of that company, by the act itself. It is the Susquehanna Bridge Company then and there created, and referred to in the act itself, whose powers and privileges are conferred, *mutatis mutandis*, upon the Chenango Bridge Company. It does not, therefore, admit of any doubt to my mind that the Chenango Bridge Company has perpetual succession without the limitation of thirty years which was originally imposed upon the parent company, but was removed by the act of 1808, and that the Chenango bridge might be built at any time, within four years from the passage of this act, instead of being required to be completed by the 1st of December, 1809, which was required of the Delaware bridge, and, as it is contended, if not

conceded, of the Susquehanna bridge, in like manner, by the act of 1805.

As the next step in the present discussion, we must go back and examine the effect of the two statutes of 1805 and 1808 upon the Susquehanna Bridge Company, and especially the construction of the 38th section of the former statute in refer ence to the privileges of that corporation. The act of 1805 incorporated the Delaware Bridge Company with specific and enumerated powers, privileges and restrictions, and with all necessary regulations for its corporate existence and management. Then the 38th section of the act created the Susquehanna Bridge Company and invested it with " all and singular the powers, rights, privileges, immunities and advantages," and declared that it shall be subject to all the duties, regulations, restraints and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company, and adds, that " all and singular the provisions, sections and clauses thereof, not inconsistent with the particular provisions herein contained, shall be and hereby are fully extended to the president and directors of this incorporation." This single section of the act is the entire charter of the Susquehanna Company, and it contains nothing beside the provisions which I have quoted, except a designation of commissioners to receive subscriptions to the stock, and regulations as to the toll on each of the bridges which the company were originally authorized to build, that is, the Susquehanna and the Chenango bridges respectively. It is very plain that the charter of the Susquehanna Bridge Company was the law incorporating the Delaware Bridge Company, applied to the first-named corporation, and modified, if necessary, to adapt it to its circumstances and design. The language conferring upon the one the powers and duties of the other is as full and comprehensive and as distinct as can be imagined, and it is given in the place of any enumeration of powers or duties in respect to the Susquehanna Company specially. Whatever, therefore, and all which is contained in the act incorporating the Delaware Bridge Company, which is not inconsistent with or inapplicable

to the Susquehanna Company, is as much a part of the charter of the latter as if it had been expressly enacted in reference to it. One or two considerations, growing out of the act of 1808, will make this still plainer, if it were necessary. The act of 1808, while it continued the Susquehanna Company in existence as a corporation, not only limited its powers and purpose to bridging the Susquehanna river only, but removed the limitation of its existence to thirty years, and gave it perpetual succession. This is an express provision of the act. But the limitation is found, not in the 38th section of the act of 1805, which expressly relates to the Susquehanna Company, but in that portion of the act relating to the Delaware Company, and is made a part of the charter of the Susquehanna Company solely by the language which I have quoted, which inserts into the charter of the one this provision contained in that of the other. So also the Delaware Company were bound to erect their bridges within a certain time. This also was considered by the legislature to have become a part of the organic law of the Susquehanna Company, since the act of 1808 expressly released the latter from this obligation also, and extended the time within which their bridge was to be constructed. It should be observed also, with reference to this latter provision, that in the original charter of the Delaware Company it is coupled with or immediately followed by a provision that, upon the completion of their bridge in the manner and within the time specified, it should be inspected by the judges of the Court of Common Pleas of Delaware county, and upon their certifying to the company's compliance with the act, and not otherwise nor before, toll might be taken. So far as this conferred powers or duties upon the judges of Delaware county, it was not applicable to the Susquehanna or Chenango bridges, which were in other counties; and yet the requirements of the act, as to the time and mode of erection of the structures, have been conceded on all hands to apply as well to the latter as to their prototypes.

The main question in this part of the case, and that upon which the Supreme Court decided the controversy against the

plaintiffs, is the question, whether the first clause of the 31st section of the act of 1805, being a part of that act relating to the Delaware Bridge Company, is made applicable to, and a part of, the charter of the Susquehanna Company, by the words of the 38th section, already quoted. The 31st section enacts that "it shall not be lawful for any person or persons to erect any bridge, or establish any ferry, across the said west and east branches of Delaware river within two miles, either above or below the bridges to be erected and maintained in pursuance of this act, except between the times the said bridges or either of them shall not be passable, or forcibly to pass the said bridges or either of them without having previously paid to the toll gatherers, for the use of said corporation, the toll hereby established for crossing said bridges." The section proceeds to give a penalty and an action to recover it for passing the bridges without paying toll, and it adds a proviso that any person may cross the rivers within the forbidden limits to or from his own land, in his own craft, without toll. The effect of this provision as to the Delaware Company is to confer upon them the privilege of excluding all other persons or corporations from bridging or ferrying for hire across the rivers which they proposed to bridge, for a distance of two miles on each side of their bridges. It is as if the legislature had said to the Delaware Company, we authorize you to build two bridges over certain rivers, and we give you the privilege of excluding all other bridges or ferries for two miles on each side of each of your bridges. Whether this was merely a privilege to last until the legislature removed the bar or exclusion, or operated as a grant and a contract against subsequent invasion of their privileges, even by legislation, will be hereafter considered. Assuming, at present, for this argument, that it was the latter, and it was manifestly no unimportant part of the privileges, immunities and advantages of the Delaware Company. The power to exclude competition, within certain limits, was hardly less valuable to them than the power to compel the payment of tolls by the exaction and enforcement of a penalty. It will not be denied that the 38th section of the act makes the latter clause

or provision applicable to the Susquehanna Company, or that they could, by virtue of it, prosecute and recover a penalty for crossing their bridge or bridges without paying the toll. After careful consideration, I am unable to see why the right to exclude all other bridges, for a certain distance, is not, in like manner, conferred upon the Susquehanna Company. It is true that the words of a grant of privileges to a corporation, in derogation of the rights or interests of the public, must be strictly construed, and nothing passes but what is explicitly granted. (1 Black U. S., 446.) But this is a rule which has but a remote application here, or certainly is not decisive of the present dispute. We are to determine this question by our apprehension of the intention of the legislature, and the meaning of their· words used in the act of 1805. If their language, by a natural and obvious construction, imports the grant of this exclusive privilege, it is but a slight argument against such a construction of it that it appears, after the lapse of fifty years, that such a grant is now opposed to public convenience. No such public covenience was affected by the grant when it was made, nor can we presume that the legislature foresaw or supposed that it ever would be; The growth and development of this beautiful and flourishing region of the State, which is now a part of our history as well as matter of observation, was then hardly imagined by any one. The necessity which the legislature saw, and the object which they evidently sought to accomplish, was to secure the construction of one bridge, and not to provide against an interference with a demand by the public convenience for more. It can hardly be supposed that the possibility of such a demand was within their contemplation at all. The argument, however, must proceed here upon the intention of the legislature at the time; and the actual consequences of their action, at a remote period, while they may prove that the legislation in question was unwise, can hardly show what that legislation really was, or was intended to be. It is undisputed that the clause in question is a part of the privileges of the Delaware Bridge Company. It is expressly declared by the

legislature, that the same privileges which they obtain shall belong to their associate company, so far as they are applicable. The question then is, whether this privilege of the Delaware Bridge Company is consistent with the nature and circumstances of the Susquehanna Company, and applicable to the bridges of the latter. It was argued that it was not applicable to the present plaintiffs, the Chenango company, because the Chenango river is a single stream, while the act is applicable and refers to the two branches of the Delaware. But the question really is, whether the privilege was conferred upon the Susquehanna Company, the parent of the plaintiffs; and the circumstances of this company nearly resembled those of the Delaware. Like the latter company, the Susquehanna Bridge Company was incorporated to bridge two streams. The Delaware Company was to bridge the east fork and the west fork of the Delaware, two distinct structures widely distant, and the other company was in like manner to bridge the Susquehanna and the Chenango. If there would be any force in the argument, applied to a direct succession of the Chenango Bridge Company to the privileges of the Delaware Company, because the act conferring these privileges upon the latter refers to two streams and their bridges, while there is but one over the Chenango, the argument loses all its force by reason of the fact that the title of the latter corporation is derived through the Susquehanna Company, which resembled the Delaware Company exactly in the point under consideration. Nor do I find any difficulty in the fact that the Chenango river terminates its separate existence by a junction with the Susquehanna, less than two miles below the plaintiffs' bridge. Whether the restriction against other bridges for two miles across the river bridged by the plaintiffs will extend to and include the greater stream into which it is merged within that distance, or whether it only extends to the mouth of the Chenango, is a question which we need not answer at present. If the restriction in question is applicable to the plaintiffs and to the river which their bridge crosses, it will extend up and down that stream two miles, so far as its existence will be recognized, and it is not inconsistent with the

existence or applicability of such a privilege for the specified distance in one direction that the river does not run or is not recognized for a similar distance from the plaintiffs' bridge in the other. It is not material to the present question, if the plaintiffs' bridge is so near the mouth of the river that there cannot be two miles of the course of the river below included within the grant. The defendants' bridge is above the plaintiffs', and I see no reason why the plaintiffs should not have the benefit of an exclusive privilege by virtue of such a clause as this for two miles above their structure, although the situation of the latter was such that a similar privilege could only include a short distance, or even nothing at all, below. I am unable to concur in the opinion expressed in the Supreme Court upon this part of the case. As I read these acts, the effect of them is that the legislature say that it shall not be lawful for any person or persons to erect any bridge or establish any ferry across the Chenango river within two miles above or below the plaintiffs' bridge. This is the language of the act; and having arrived at the conclusion that it is applicable to the plaintiffs, the next question is upon its effect.

The legislature reserved no power to alter, amend or repeal these acts, or any portion of the privileges conferred upon these companies. The plaintiffs contend that this clause of the statute of 1805 is a contract by the State that they will grant no liberty or authority to any person to bridge or ferry across their waters within the specified limits, and that the subsequent incorporation of the defendants to bridge the Chenango river less than two miles above the plaintiffs' bridge is a violation of this contract, and is, therefore, void under the provision of the Constitution of the United States, forbidding the States to pass laws which impair the obligation of contracts.

That the legislature of a State may bind the State by a contract, and that such a contract is within the protection of the Constitution of the United States, so that the act containing it cannot be repealed, nor the rights conferred or the obligations assumed by it impaired by subsequent legislation,

are doctrines long established both in the Federal and State jurisprudence. (*Providence Bank* v. *Billings*, 4 Pet., 561; *Charles River Bridge* v. *Warren Bridge*, 11 id., 420; *Richmond R. R.* v. *Louisa R. R.*, 13 How., 71; *Boston & Lowell R. R.* v. *Salem & Lowell R. R.*, 2 Gray, 1.) A State may even limit or measurably part with its taxing power, one of the highest attributes of sovereignty, and that by a clause in the charter of a corporation; and such a charter is a contract from which future legislatures cannot depart, nor tax the corporation otherwise than according to its provisions. (*State Bank of Ohio* v. *Knoop*, 16 How., 369; *Ohio L. & T. Co.* v. *Debolt*, id., 416; *Jefferson Branch Bank* v. *Skelly*, 1 Black U. S. R., 436.) If, in the present instance, the plaintiffs' charter contains a clause to the effect that the State will not authorize nor allow any bridge or ferry within two miles of the plaintiffs' bridge, then the plaintiffs present a contract made with them by the State, and which the State could not violate or impair by chartering the defendants. The case thus comes to a question of the meaning and effect of this clause in the statute. Upon this subject we are not furnished with any case precisely parallel. In *The Mohawk Bridge Co.* v. *The Utica & Schenectady R. R. Co.* (6 Paige, 554,) Chancellor WALWORTH expressed the opinion that a prohibition against the establishment of a ferry within a certain distance of the plaintiffs' toll bridge did not deprive future legislatures of the right to authorize the erection of another bridge within the prescribed limits whenever the public good should appear to require it. The circumstances of that case, however, were different from the present, since the defendants there did not propose to carry passengers who merely desired to cross the river, and would otherwise employ the plaintiff's bridge, but only travelers in their railroad cars from one part of the State to another. The railroad bridge, as the Chancellor observes, was not a toll bridge within the meaning of the grant to the Mohawk Bridge Company. In the case of *Thompson* v. *N. Y. & Harlem R. R.* (3 Sand. Ch. R., 625), Vice-Chancellor SANDFORD construed a clause perhaps still more closely resembling that in question here, as not

restricting the power of the legislature to permit the construction of other bridges, but only the right of individuals without such permission or authority. But in this case also the bridge, whose erection was complained of, was a railroad bridge for the transportation of passengers in railroad cars, and not for the ordinary purposes of a bridge, or of a character to compete with the plaintiffs. The doctrine of the *Charles River Bridge Case* (11 Pet., 420,) is, that no contract that other ferries or bridges across the same waters shall not be erected or authorized is to be implied from the mere grant to a corporation of the right to erect and maintain a bridge and take tolls for using it. In the opinion in that case, the statement of Lord TENTERDEN, in the case of the *Stourbridge Canal* (2 B. & A., 793,) is quoted with approval, that such an act of incorporation is a contract between the public and a company of adventurers, and that any ambiguity must operate in favor of the public, and the grant be construed strictly against the company. In the recent case of the *State Bank of Ohio* v. *Knoop* (16 How., 388,) however, these authorities are adverted to by Judge McLEAN, and his reasoning and the judgment of the Supreme Court of the United States in that case shows that the extent of the rule to be derived from these decisions is, that a right set up under such a grant must clearly appear, and is not to be presumed. The rule is undoubtedly to be found in these and other cases, that in a grant of privileges or franchises by a State, as in a royal grant, nothing passes by mere implication. Yet the construction of the express words of such a grant must be reasonable and sensible, and its objects are not to be defeated by a narrow and literal interpretation of words fairly susceptible of an enlarged sense.

The 31st section of the act of 1805 confers upon the corporation or corporations to which it applies two distinct privileges: one that it should not be lawful for any person to have any other bridge or ferry within a certain distance of those authorized by the act, and the other that it should not be lawful for any person to pass the bridges of the corporation without paying toll. These privileges are given in the same terms,

and in immediate succession. The act declares, in precisely the same phrase, that it shall not be lawful for any persons to erect any bridge within the prescribed limits, or to cross the bridge to be built by the company without paying toll. Both these grants must receive a similar construction. If the interpretation applied by the defendants to that part of the section forbidding the establishment of another bridge or ferry be correct, the residue, which confers upon the plaintiffs the right and the power to exact tolls for the use of their bridge, must be construed in a similar manner.

If the legislature are not forbidden by the clause now in question from authorizing the construction of another bridge within the limit of two miles, they are equally at liberty to authorize any person to pass the plaintiffs' bridge without the payment of tolls. This would leave the most vital and valuable part of the plaintiffs' franchise, notwithstanding the irrepealability of the statute conferring it, wholly at the mercy of subsequent legislatures. It is a consequence which would hardly be contended for by any lawyer, and yet it is difficult to see how it could be escaped, if the principles of construction for which the defendants contend are to be adopted.

The bridges or ferries which this section is designed to prohibit within two miles of the plaintiffs' bridge are evidently such bridges and ferries as are highways, or open to the use of the public, either free of charge or under the payment of tolls. Private bridges or other means of crossing the stream for the convenience of individuals adjoining it are not within the mischief against which the act aims to protect the corporation, and the section contains a proviso expressly excepting them. But a bridge or a ferry for general and public use, whether as a common highway, or upon payment of tolls, could not be erected or maintained by individuals without authority of law. The first would require at least the action of the public authorities under the existing laws to open or to accept it, and the latter could not be established at all without the interposition of the legislature to create and confer the franchise of taking tolls and maintaining the bridge or the

ferry. If the section of the statute which we are considering forbids nothing but the establishment of a ferry or a bridge without authority of law by private individuals, it was unnecessary, since the existing laws were adequate to protect the company against any such acts and against any invasion of their privileges not directly authorized by legislative authority.

Besides, if the erection of a bridge by authority subsequently expressly given by the legislature is not forbidden by such a clause, why should the subsequent erection of a bridge by individuals, under the authority of general laws already existing, be held within *its* scope? *If the clause does not extend* to the action of the legislature, it seems to me to forbid nothing but unlawful acts, and this, as I have observed, was unnecessary, if not nugatory.

It is true, that when the legislature in an ordinary statute declares that a particular act is not or shall not be lawful, it simply declares a fact, and a fact which it is at any time competent to alter, by establishing a different rule of law in the particular referred to. But this statute is more than a mere law : it is a contract with the plaintiffs; and the provision that the erection of another bridge shall not be lawful, is one of its terms. It would be a narrow and unreasonable construction of a contract, by a private individual, that a certain thing should not be done, to hold that its meaning was that it should not be done until he chose to permit it. The thing stipulated against by this statute is something which the legislature alone can do or authorize to be done; and it is as narrow and but as little more reasonable a construction of their language, declaring that it shall be unlawful, to regard it as meaning that it shall not be lawful until they choose to authorize it. The question is not one of implication, but of construction; and while nothing is to be implied, yet such a statute is to be construed fairly, and with a reference to its purpose and effect. It seems clear to me that when the legislature agree that an act shall not be lawful or be done, they agree that they will not do it, or make it lawful or permissible for others to do it. I read this statute, therefore, as the judges of

the Supreme Court did, as forbidding the legislature from conferring the privilege of maintaining a bridge or a ferry within two miles of the bridge or bridges to which this provision applies. I differ with them in considering that the plaintiffs are entitled to the benefit of the provision in question, and that it forms a part of their charter and is applicable to their bridge.

The argument from inconvenience cannot be listened to by a court. If the legislature have conferred such privileges as these upon the plaintiffs, it is no answer to them to say that it was unwise, inconsistent with sound policy or indicative of a want of foresight to do so. These are considerations for the legislature and not for us. But there is an answer to this argument. If the possession of this exclusive franchise, or of a monopoly of the travel across this river, is prejudicial to the public interests—if those interests demand the opening of other avenues or the removal of all tolls or restrictions to the passage to and from the two portions of the village of Binghamton which are separated by the Chenango—the remedy is an easy and an obvious one. The State possesses the power, by an exercise of its eminent domain, to confiscate to public use both the bridge and the franchise of the plaintiffs. (*West River Bridge Co.*, 6 How. U. S., 507; 13 How., 83.) If the public necessities require, these can both be taken away and the bridge opened to public use, upon due compensation to their owners. This, of course, would not accomplish the objects of the defendants, since, in destroying the profits of the plaintiffs by opening their bridge to public use without toll, it would of course equally destroy the value of the defendants' bridge as a source of income. But so far as the public are concerned, and it is their interests alone which, in this aspect of the case, we are to regard, their necessities would be provided for. When the first bridge should become free and open to public use, of course all restriction upon the erection or maintenance of others would be removed, with the removal of their object and of any interest in any person to supplant them. The monopoly may thus be terminated and the means

of transit multiplied to any extent, while the rights guaranteed by the legislature to the plaintiffs would be protected and compensation awarded them for these rights when the public good demanded their extinction.

I am of opinion that the judgment of the Supreme Court in this case should be reversed, and judgment given for the plaintiffs.

DENIO, Ch. J., (dissenting). The Supreme Court determined the case against the plaintiffs, on the sole ground that there was no prohibition contained in the legislative enactments which constitute the plaintiffs' charter against the erection of other bridges over the same stream and in the vicinity of their bridge. But that court was of the opinion, both at the special and the general term, that if the restriction contained in the charter of the Delaware Bridge Company had been incorporated in the plaintiffs' charter, it would have constituted a contract between the State and the corporators which would have been within the protection of the provision of the Constitution of the United States which forbids the passage of any law by a State impairing the obligation of contracts; and the learned justice who determined the case at the special term has prepared an extended statement of the reasons for that opinion, in which I understand the general term substantially to concur. We have recently had occasion to examine the same point in another case, where, although the cause was decided on other grounds, we came to the conclusion that the legislature might, for the benefit of the corporators, annex to a grant of corporate franchises a restriction upon legislative power over a particular subject, which would bind the State, and all claiming under it, as constituting one of the terms of a contract which could not, consistently with the Federal Constitution, be impaired, as to its obligatory effect, by subsequent legislation. (*In the matter of Oliver Lee & Co.'s Bank,* 21 N. Y., 9.) In this class of cases, which involve questions arising under the Constitution of the United States, we receive the matured judgments of the Supreme Court of the Union

as authentic evidence of the law, because it is the tribunal which the Constitution itself has appointed to decide such questions; and our judgments are subject to review there, and to be reversed if they shall fail to conform to the law as laid down. In a series of decisions, commencing with *Fletcher* v. *Peck* (6 Cranch, 87), embracing *Dartmouth College* v. *Woodward* (4 Wheat., 518), and other intermediate ones, and coming down to the modern cases of *The State Bank of Ohio* v. *Knoop* (16 How., 369), and *Dodge* v. *Woolsey* (18 id., 331), the doctrine is firmly settled that a grant or other executed conveyance is a contract, in the sense of the Constitution; that grants and conveyances made by means of statutes passed by the State legislatures are equally within the Constitution as private grants between individuals; and that a State may, by means of a grant effected by a public statute, impose restraints upon the law-making power, which restraints it is not within its competency to abrogate by a subsequent statute. The cases referred to from Howard's Reports are striking examples of restrictions upon the power of taxation over particular subjects, effected by statutes granting corporate franchises, but which, as it was held, the State could not by any subsequent act of legislation remove. (See also *The Ohio Life and Trust Co.* v. *Debolt*, 16 How., 427, per TANEY, Ch: J.) The force of this course of decision is not at all weakened by the judgment in the case of *The Charles River Bridge* v. *The Warren Bridge* (11 Peters, 420), in which, though it was held that the exclusive right of the plaintiffs could not be sustained, the decision was placed wholly upon the ground that the plaintiff's charter did not, by its terms, or by any allowable implication, forbid the legislature from authorizing the establishment of another bridge. The opinion of the court, pronounced by Mr. Chief Justice TANEY, proceeds throughout on the assumption that the legislature of Massachusetts was competent to bind itself to an engagement against the erection of another toll bridge, and insists only that, in the case before it, it had not done so. The case may contain doctrines in respect to the construction of statutes applicable to the present case; but it plainly con-

cedes that where, in the charter of a bridge company, there is an explicit prohibition against establishing another bridge, it is binding upon the State, and the obligation cannot be renounced by succeeding legislatures. The doctrine has recently been reasserted in the Supreme Judicial Court of Massachusetts, in the case in which the charter of an early railroad company contained a provision that no other railroad than the one thereby granted should, within thirty years after the passage of the act, be authorized to be made upon the same route. Charters were subsequently granted by the legislature to several railroad corporations, which, together, authorized a line of railroads nearly corresponding with the plaintiff's road. The court, after hearing an elaborate argument, and by a carefully prepared opinion by the late Chief Justice SHAW, decided in favor of the plaintiff's claim to an exclusive right, and gave judgment for an injunction against operating the defendant's roads.

The most serious question, therefore, in the present case is, whether the prohibition against constructing other bridges within a distance of two miles is part of the charter of the Chenango Bridge Company.

It will be seen that the act of 1805 provides for the incorporation of two separate bridge companies, one of which was to be called the President and Directors of the Delaware Bridge Company, and to have for its object the erection of a bridge across each of the two branches of the Delaware river, where the turnpike road passed over them; and the other to be called "The Susquehanna Bridge Company," for the construction of two other bridges to be laid across the Susquehanna and the Chenango rivers respectively, at points indicated. The series of provisions respecting these companies is introduced by a very significant preamble. It sets forth an urgent public necessity for these bridges, by declaring in effect that the motives which led to the incorporation of the turnpike roads, provided for in the same act, cannot be carried into full effect, or the public convenience promoted, without the bridges. It then sets out the necessity which was thought

to exist of extending extraordinary encouragement to the enterprise, on account of the difficulty of the work, its exposure to injury from sudden freshets, and the probability that " a frequent renewal of the whole capital" would be required to secure permanent and durable bridges. This recital is introductory of, and applies equally to, the subsequent provisions respecting each of the bridge companies, and is, therefore, as applicable, so far as appears, to the bridge over the Chenango as to either of the others. Its object is to explain the reason for offering the peculiar inducements which are held out to encourage parties to undertake the several enterprises; in order that those who might in future years be called upon to expound the act may understand the motives which led to its enactment. These inducements consist in the rates of toll allowed to be taken, the duration of the charters, and especially, as it seems to me, in the provision for securing the corporators against interference with the franchises granted, by the establishment of ferries or the erection of competing bridges. As these inducements were, so far as the act discloses, equally necessary to promote the erection of each of the bridges, there is no reason, *a priori*, for supposing that the Chenango bridge was not as fully within the intention of the legislature, in offering them, as either of the other three bridges. We are to look also into the system upon which the several detailed provisions are framed and adjusted to the two corporations; and the scheme was this: to provide in the outset for the formation of one of the corporations (the Delaware Company being chosen) and to attach primarily to that one all the provisions and regulations which it was thought expedient to enact respecting both companies, and then to provide for the incorporation of the other company, and to adapt these provisions and regulations to that corporation by brief words of reference. The act is obviously drawn in conformity to this system. Among the special provisions which are numerous and are set down in great minuteness of detail, employing some fifteen sections, is that one which declares that it shall not be lawful for any person to erect any bridge or establish any ferry across the

said west and east branches of the Delaware river, within two miles either above or below the bridge to be erected and maintained in pursuance of the act. The Delaware Bridge Company being thus fully constituted, the Susquehanna Company is then provided for in a single section. The location of the two bridges to be constructed by that company is fixed, and the name of the corporation is stated; and the section then proceeds to declare that the said Susquehanna Bridge Company "and their successors and assigns shall and may have perpetual succession, and shall be and hereby are invested with all and singular the powers, rights, privileges, immunities and advantages, and shall be subject to all the duties, regulations, restraints and penalties, which are contained in the foregoing incorporation of the Delaware Bridge Company;" and it declares that "all and singular the provisions, sections and clauses thereof, not inconsistent with the particular provisions herein contained, shall be and hereby are fully extended to the president and directors of this incorporation." The section then provides for commissioners to open the books of subscription to the stock, and for the rate of tolls, which are to be the same for the bridge over the Chenango river as are provided respecting one of the bridges of the Delaware Company, and for the bridge over the Susquehanna, one-third more; and this is all which is said respecting this company. The intention of giving to the two companies precisely the same facilities, and of making them, as far as possible, exactly similar in all respects, is very apparent. The draftsman was assiduous in bringing together a great many words to express that intention, and was apparently fearful that some ingenious criticism would find grounds to distinguish between them, contrary to what he intended. Now as these charters were designed to continue for thirty years, and could not be expected to be immediately profitable, the provision forbidding competition must have been regarded as of great importance. The adventurers must necessarily look to the future for their reimbursement for the outlay which they must immediately incur; but in order to rely upon that resource,

they, we may suppose, required a guaranty against other competitors for the profits of the transit across the river, which the increase of population and the opening of the country to settlements were expected to bring. Such a guaranty was inserted in very explicit language, in the provisions respecting the bridges spanning the Delaware. If that guaranty is not also applied to the bridges of the other company, it was undoubtedly owing to an accidental omission, the motives for attaching it to these bridges being equally cogent as in the case of those crossing the Delaware; and the general intention to give each of the companies a charter exactly similar, being, as has been mentioned, abundantly apparent.

With this general outline of the statutes, we are prepared to examine the particular mode of reference by which the restraint in question is supposed to be engrafted upon the charter of the Susquehanna Bridge Company. That company is invested with all the rights, privileges, immunities and advantages of the Delaware Company. If the language of the provision respecting that company had been that no person should erect a bridge or establish a ferry within two miles either up stream or down stream from the bridges erected by them, this power of excluding competition would have been a right and a privilege, and moreover an immunity and an advantage, which, beyond all question, would have been annexed to the Susquehanna company equally with the Delaware company. But the prohibition is, in terms, against erecting a bridge across either of the branches of the Delaware river within the prescribed distance; and it is because the streams of water are named, that it is argued that the prohibition cannot be applied by the modes of reference which are used to the bridges over the other streams. It is very true that a provision incorporated into the Susquehanna charter, that bridges should not be erected over the Delaware river, would be idle and absurd. But I am of opinion that the construction contended for by the defendants would be too narrow and literal. It was, I think, the substance of the provision in the first mentioned charter, as distinguished from the verbal

phraseology, which was to be imported, by means of the words of reference, into the other. Reasonable consideration should be given to the theory on which the act was framed. The form adopted was resorted to in order to avoid tedious repetition; but great care was taken that no provision relating to the former company should be left out in the other. This is obvious from the further language of the section. As all the rights, privileges, &c., of the Delaware company were conferred upon the other, the latter was also charged, as was manifestly just, with all the duties, restraints and penalties, which had been enacted respecting the first named company; and for abundant, if not by excessive caution, it was added that all the provisions, sections and clauses of the Delaware charter, not inconsistent with the particular provisions contained in the act should be "fully extended" to the Susquehanna company. The substance of the provision against competition was not at all inconsistent with anything contained in the act, but was perfectly homogeneous with its scope and intention. A literal construction which should shut out from the Susquehanna charter all the provisions primarily annexed to the incorporation of the Delaware company, which could not be transplanted in *hæc verba* into the other, would quite subvert the intention of the legislature. The act gives, in quotation marks, the form of the subscription paper to the stock; and the promise contained in it is to pay the sums subscribed to "The President and Directors of the Delaware Bridge Company." It would, of course, be absurd to use such a paper for obtaining subscriptions to the stock of the Susquehanna company. Then the provision for inspection requires the official action of the judges of the Court of Common Pleas of the county of Delaware; and yet it is preposterous to suppose that they were to go out of their own county to inspect the bridges at Chenango Point, while there were judges of the same grade in the proper county. So in regard to the directions for publishing notices of the meeting of the stockholders to choose directors. They are adjusted to the locality of the Delaware bridges, and would have to be

accommodated to the other locality, or they could not be used.

It is argued by the defendants' counsel that settled rules of interpretation forbid a liberal construction of statutes of the character of that under consideration. If by such a construction is meant the giving a statute a scope beyond the language, for the purpose of embracing cases of a similar character with those provided for in terms, by means of what is called an equitable construction, I admit that such an interpretation cannot be given to statutes like this one, which does, upon the plaintiffs' construction, prohibit what would otherwise be a matter of right. It is, no doubt, of the class of enactments which the courts ought not to interpret in equity, as is shown by the cases to which the defendants' counsel have referred. The most prominent one is *The Stourbridge Canal Company* v. *Wheeley* (2 Barn. & Adolph., 792.) The proprietors of a canal, constructed pursuant to an act of Parliament, were authorized to exact certain tolls upon every ton of goods, in boats, navigated on any part of the canal, and which should pass through one or more of the locks. A portion of the canal was capable of being navigated without the necessity of passing through any of the locks, but it was held that toll could not be exacted unless there was an actual passage through a lock. The case was not within the letter, though it was, perhaps, within the equity, of the act; but in such a case an equitable construction was not admissible. In the present case, I think the prohibition respecting other bridges is incorporated into the Susquehanna corporation by the very words used by the legislature. They are broad enough to embrace the substance and real meaning of the provision. The only question is one of intention; and I have already stated my reasons for thinking that there was a plain design on the part of the legislature, that the two corporations should be precisely alike in this as well as in all other particulars, except the different points at which the bridges were to be erected.

But it is argued on behalf of the defendants that the prohibition against the erection of other bridges within a given

distance, even if it is incorporated into the Susquehanna charter, does not disable the legislature from passing a law authorizing other bridges to be erected, but that it is only a restraint upon unauthorized individuals. In determining this point we must keep in mind that the provision against competing bridges is one of the terms of a contract between the corporators and the State; that the legislature, acting in behalf of and fully representing the State, and being the law-making power of the State, was virtually the party bound by the prohibition; and that the object of inserting it in the act was to secure to the adventurers a more certain provision for the reimbursement of the moneys which they would have to expend in constructing the bridges. If the legislature was competent to license another association of adventurers to build competing bridges at a considerable distance of time, but within the continuance of the charter, they could do it at any earlier period, or as soon as the first bridges were constructed; and if they could license others by granting to them an act of incorporation, *a fortiori* they could erect a free State bridge, and thus remove all obstructions to the passage of the river, otherwise than upon the plaintiffs' bridge. I think such a construction would do great violence to the true meaning of the contract. The legislature must be understood to have offered to the parties proposing to erect the bridges that they should receive toll at the rates mentioned in the act, and that they should not be subject to be interfered with or diminished by competing bridges, erected within the prescribed distance. Such is the substance of the undertaking on the part of the public. If the legislature were left free to erect bridges themselves, or to license others to do so, the provision would be wholly illusory. We can have no idea of a contract where one of the parties only is bound, or of a contract annexed to a grant which may be renounced by one of the parties as soon as it was made. The position of the defendants' counsel does, at first view, appear to derive some support from the case of *Thompson* v. *The New York and Harlem Railroad Company* (3 Sandf. Ch., 625, 659). In that case the plaintiff's toll bridge

Chenango Bridge Company *v.* Binghamton Bridge Company.

across the Harlem river was erected pursuant to an act of the legislature which contained a prohibition, in terms, very similar to that which we are considering; and the violation of their rights, of which the plaintiff complained, was the passage of the Harlem railroad across the river by means of a bridge. The learned Vice-Chancellor (SANDFORD) declared that this was not such an interference as was contemplated by the prohibitory provision; a railroad bridge being, as he conceived, incapable of being used for the passage of any vehicle, animal or foot passenger, for whose passage the proprietors of the chartered bridge were entitled to receive toll. He added, in effect, that if the progressive spirit of the age had developed and matured a mode of conveying passengers and freights from place to place, across rivers and over morasses, which was unknown when the act chartering the plaintiffs' bridge was enacted, there could be no doubt that the legislature, in the exercise of its sovereign duty to provide ways and means for the use of the people, might authorize the construction and use of such new invention, although the necessary consequence might be that the former modes of conveyance would be superseded, and that those who were profitably engaged in their pursuit would be subjected to the loss of their business and capital. I entirely concur in this view, and consider it quite sufficient for the decision of that case in favor of the defendant. The same point had been decided the same way by Chancellor WALWORTH, in *The Mohawk Bridge Company* v. *The Utica and Schenectady Railroad Company* (6 Paige, 554). But the Vice-Chancellor, in the Harlem railroad case, in addition to the satisfactory ground for his judgment which I have mentioned, remarked that the act chartering the plaintiffs' bridge did not declare that the legislature would not permit another bridge to be erected. " Indeed," he added, " the declaration inserted in the second section (the prohibitory clause) was evidently aimed at the rights which it was supposed the inhabitants of Morrisania and Harlem might claim under their old patents, rather than to any interference by others with the franchise granted to the bridge company; as to all persons other than the inhabit-

ants of Morrisania and Harlem, such a provision was wholly unnecessary, because no one could set up a toll bridge or ferry without authority from the State." . In the present case the prohibitory declaration was intended, beyond all doubt, to prevent the interference of other persons with the company's franchise; and if the facts in the Harlem case proved, as the learned Vice-Chancellor stated, that other motives and other objects were aimed at by the corresponding provision·in that case, it would be no precedent for the present one, if there had not been another objection upon which the decision might turn, and if the case were otherwise a binding authority.

To state my conclusion on this part of the case in a few words: The State, through the law-making power, contracted with the bridge company that, if it would build and maintain the bridges in question, the law would not permit any other person to put up a bridge over the stream, within two miles, either way, from such bridges. The chartering of another company, with authority to construct a bridge within that distance, was a plain violation of the bargain; and as it was a contract within the protection of the Constitution of the United States, the second charter was null and void.

The act of 1808 (ch. 119) divides the Susquehanna company into two companies, one of which was to retain the name of the Susquehanna Bridge Company, and to be limited to erecting and maintaining the bridge across the Susquehanna under all the provisions of the charter given to that company by the act of 1805, except the limitation of its duration to thirty years (which limitation was expressly repealed); and by the next section of the act the other company, which is the plaintiff in this suit, was to be called "The Chenango Bridge Company," and to have for its object the erecting and maintaining the bridge now in question over the Chenango river; and it was to be a corporation with perpetual succession, "under all the provisions, regulations, restrictions, clauses and provisions of the before mentioned Susquehanna Bridge Company." There is no difficulty of the character with that supposed to exist in the former case, in giving full effect to these

modes of reference. After giving the Susquehanna company an unlimited charter and all the faculties and incidents which it had under the act of 1805, it incorporates the Chenango company, and endows it with the same precise rights, faculties and incidents.

Under this act the plaintiffs' bridge was built, and they claim for it the rights intended to be secured to them by the legislative provisions enacted in its favor. I think we are obliged by the law to protect them in the enjoyment of those rights.

It is probably true that the condition of the country has so far changed that the public convenience requires further accommodations for crossing the river at this point than the plaintiffs' bridge affords. They may show that the legislative acts which we have been examining were improvidently passed. But the men of that day thought otherwise. Whether the present state of material progress in that region has been accelerated to any extent, or if it has, to what extent, by the expenditures of the plaintiffs' corporation, it is impossible to say, nor can we determine whether less encouragement than was. given would have accomplished equal results. We are only concerned to determine accurately what the precise terms of the legislative contract were, and to give them effect. The circumstances of this case may lead to doubt, in some minds, whether this series of adjudications, which has attributed to legislative acts of this character the force of contracts, within the constitutional provision, was, upon the whole, wise and legally sound. Cases may certainly be presented, if this is not one, where we may think that the private interest of the corporators ought to be forced to give way to the public good. But after a uniform course of decision of the court of last resort upon such questions, upon this precise point, extending over more than half a century, a court possessing only a subordinate jurisdiction upon this class of subjects cannot be expected, at this day, to depart from the old and to strike out a new path.

It is not for us to determine, in this action, whether the franchise possessed by the plaintiff is subject to the exercise

of the right of eminent domain residing in the government of this State. For myself, I cannot see how proprietary rights, acquired under such a contract, should be more sacred than other property which a citizen or a corporation may possess; and such I understand to have been the judgment of the courts when the question has arisen. (*West River Bridge* v. *Dix*, 6 How., 507; *Richmond, &c., Railroad* v. *Louisa Railroad*, 13 id., 83; *Boston R. R. Co.* v. *Salem R. R. Co.*, 2 Gray, 1.) But it will be time enough to consider this question when it shall arise. It would be presented by an act which should appropriate the plaintiffs' franchise to public use, providing at the same time an adequate compensation for the loss.

The result of these views is that the judgment appealed from should be reversed, and judgment entered for a perpetual injunction against the maintenance of the defendants' bridge across the Chenango river.

BALCOM, J., did not sit in the case.

Judgment affirmed.